**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **STEPHEN C.[1],** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 7:21cv00493** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Stephen C. ("Stephen") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Stephen alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) assess his mental impairments; (2) determine his RFC, including using a function-by-function analysis; and (3) assess his allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 17), and **DENYING** Stephen's Motion for Summary Judgment (Dkt. 15).

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence exists to

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

support the Commissioner's conclusion that Stephen failed to demonstrate that he was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Stephen filed for DIB in August 2019, claiming his disability began on June 1, 2012[3], due to upper and lower back pain, gout, numbness in both legs with frequent falls, obesity,

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] Stephen amended his alleged onset date to January 24, 2017 at the hearing with the ALJ, due to a prior unfavorable decision dated January 23, 2017. R. 40, 88. However, the ALJ's opinion uses the original alleged onset date of June 1, 2012 (R. 16) and considers all the medical evidence dating from the original alleged onset date. Neither Stephen nor the Commissioner allege error on this ground, and I likewise find that any error in the ALJ's failure to amend the alleged onset date of disability was harmless. The ALJ was entitled to consider all the evidence in determining disability, including the medical evidence from June 2012 until the date last insured, December 31,

osteoarthritis, chronic fatigue, sciatica, left shoulder pain, depression, and anxiety. R. 14, 195.

Stephen's date last insured was December 31, 2017; thus, he must show that his disability began

on or before this date and existed for twelve continuous months to receive DIB. R. 14; 191; 42

U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state

agency denied Stephen's application at the initial and reconsideration levels of administrative

review. R. 84–101. On January 20, 2021, ALJ Thomas W. Erwin held a hearing to consider

Stephen's claim for DIB. R. 35–66. Counsel represented Stephen at the hearing, which included

testimony from vocational expert Mark Hileman. On January 29, 2021, the ALJ entered his

decision analyzing Stephen's claim under the familiar five-step process[4] and denying his claim

for benefits.[5] R. 14–29.

The ALJ found that Stephen was insured at the time of the alleged disability onset and

that he suffered from the severe impairments of obesity, degenerative disc disease, peripheral

neuropathy, polyarthralgia, diabetes, gout, hypertension, sleep apnea, depression, and anxiety.

R. 16–17.[6]  The ALJ determined that these impairments, either individually or in combination,

---

2017. See Alston v. Colvin, No. 4:13CV65, 2014 WL 934532, at *9 (E.D. Va. Mar. 10, 2014) (citing 20 C.F.R. §§
404.1512(b)(2) and finding that the ALJ's failure to amend the alleged onset date was harmless where the plaintiff
had not "demonstrated that consideration of the greater period of time renders the ALJ's decision unsupported").

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence,
whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the
requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform
other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520);
Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant
disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of
proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the
Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the
claimant's age, education, work experience, and impairments, to perform available alternative work in the local and
national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5] Stephen was 45 years old on his date last insured, making him a younger person under the Act. R. 27.

[6] The ALJ found that Stephen's finger laceration and surgery, trigger finger, post release surgery, shoulder
pain, and isolated episodes of cocaine use were non-severe impairments. R. 17. In July 2017, a doctor noted a
positive drug screen for cocaine, for the second time in five months, though Stephen indicated he "went to a party
with friends" and denied using cocaine consistently. R. 534.

did not meet or medically equal a listed impairment. R. 17.  The ALJ specifically considered listing 1.02 (major joint dysfunction), listing 1.04 (disorders of the spine), listing 11.14 (peripheral neuropathy), listing 12.04 (depressive, bipolar, and related disorders), and listing 12.06 (anxiety and obsessive-compulsive disorders). The ALJ also considered Stephen's obesity in accordance with SSR 19-2p and his diabetes mellitus under SSR 14-2p. R. 18. The ALJ found that regarding his mental impairments, Stephen had moderate limitations in interacting with others and concentrating, persisting, or maintaining pace, a mild limitation in adapting or managing oneself, and no limitation in understanding, remembering, or applying information. R. 19–20.

The ALJ concluded that Stephen retained the residual functional capacity ("RFC") to perform a limited range of sedentary work. R. 21. Specifically, Stephen cannot operate foot controls or be exposed to hazards or unprotected heights. He can occasionally kneel, crouch, and crawl, and be exposed to extreme cold and pulmonary irritants. Stephen cannot perform production rate or pace work, defined as having to keep up with an assembly line, or a job with strict daily or hourly quotas, and can have no more than occasional interaction with the public. Id. The ALJ determined that Stephen was unable to perform his past relevant work as a painting supervisor but could perform other jobs that exist in significant numbers in the national economy, such as addressing clerk, printed circuit board touch up screener, and document preparer. R. 27–28. Thus, the ALJ determined that Stephen was not disabled. R. 28–29. Stephen appealed the ALJ's decision and the Appeals Council denied his request for review on August 6, 2021. R. 1–4.

## ANALYSIS

Stephen alleges that the ALJ failed to properly assess his mental impairments, determine his physical RFC using a function-by-function analysis, and assess his allegations regarding his symptoms.

### A. Medical History Overview

1. Medical Treatment

Stephen has chronic physical conditions, including diabetes, degenerative disc disease, hypertension, gout, and obesity, that predated his alleged onset date and were treated by his primary care doctor, Qasir Raza, M.D. during periodic visits. Stephen's diabetes fluctuated between being poorly controlled, with some periods of improvement with new medication and losing weight R. 286, 290–93. For example, in January 2014, Dr. Raza noted that Stephen "has diabetes mellitus which is uncontrolled . . ." but by February 2014 his blood sugar readings are "much better." R. 280, 286. After a gap in treatment, in January 2016, Dr. Raza noted that Stephen's diabetes treatment was "very effective," and Stephen reported exercising, losing weight, and feeling "well overall." R. 380. However, in May and October 2017, Dr. Raza again noted Stephen's diabetes was poorly controlled due to noncompliance. R. 616, 619. Stephen received treatment for trigger finger, including an injection in July 2015, which he reported was unhelpful, and ultimately a surgical trigger release in May 2016. R. 1027, 1032.

Stephen also consistently complained of widespread pain, especially back pain, and began treating with a rheumatologist, Gary Bayliss, M.D. in April 2013.[7] R. 1064–68. An x-ray of his spine in April 2013 showed mild degenerative disc disease. R. 286, 358. Dr. Bayliss

---

[7] Stephen indicated he has suffered worsening back pain for approximately 20 years, since he was hit by lightning at age 21. R. 332, 693.

referred him to pain management doctor Marc A. Swanson, M.D. in January 2014, who recommended water exercise, weight loss, and injections. R. 335. Stephen elected to try injections, which he reported did not help with the pain. R. 343. An MRI in June 2014 showed a small right foraminal disc herniation, which did not "appear to affect the exiting nerve." R. 378. Stephen had a spinal cord stimulator implanted in August 2016, following a trial where he reported 50 percent improvement. R. 415, 744–45. At a follow-up appointment a month later, he reported "doing well" but needed the spinal cord stimulator adjusted; however, by November 2016, he reported worsening pain. R. 426, 437. On examination at his pain management follow-ups in 2017, Stephen generally had tenderness in the lumbar spine and lower extremities, and moderate limitations in range of motion in his lumbar spine, with negative straight leg raise test, no edema, normal muscle tone and strength, and walking with a limp. R. 398, 537, 555–56, 566, 571.

Stephen's primary care doctor also treated his anxiety and depression. In February 2017, Dr. Raza referred him for an initial evaluation with Bruce A. Sellars, Psy. D., due to Stephen's reports of increasing depression and panic attacks. R. 691. Dr. Sellars found appropriate affect, good speech, normal orientation and reality testing, sleep interrupted by pain, increased appetite due to boredom, and diagnosed generalized anxiety disorder and persistent depressive disorder. R. 692.

2. Medical Opinions

State agency physicians, Bert Spetzler, M.D. and Richard Surrsuco, M.D., reviewed the record in January and March 2020 and found Stephen capable of a limited range of light work. R. 91–92, 99–100. The ALJ found these opinions not persuasive, on the grounds that the record evidence is consistent with a sedentary RFC. R. 25.

State agency psychologist Julie Jennings, Ph.D. also reviewed the record and completed a psychiatric review technique form finding a moderate limitation in understanding, remembering, or applying information, mild limitations in concentrating, persisting, or maintaining pace, and adapting or managing oneself, and no limitations in social interaction. R. 88. The state agency psychologist on reconsideration reviewed the record and found insufficient evidence to fully evaluate Stephen's mental impairments. R. 99.

**B. Mental Impairments under SSR 96-8P**

Stephen argues that the ALJ failed to properly assess his mental impairments as required by  SSR 96-8P.[8] See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Specifically, Stephen argues that the ALJ failed to explain how the RFC accommodated his moderate limitations in concentrating, persisting, and maintaining pace, and in interacting with others, and failed to address his ability to sustain work over an eight-hour workday. The Commissioner responds that Stephen's argument "entirely ignores" the ALJ's full discussion of mental health evidence with a corresponding explanation of the RFC restrictions.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011).   The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR

---

[8]  Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

96-8P at *7; <u>Meadows v. Astrue</u>, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012

WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing <u>Davis v. Astrue</u>, No. 9-cv-2545, 2010 U.S.

Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); <u>Monroe v.

Colvin</u>, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate

and logical bridge from the evidence to his conclusion" and holding that remand was appropriate

when the ALJ failed to make "specific findings" about whether the claimant's limitations would

cause him to experience his claimed symptoms during work and if so, how often).

     In <u>Shinaberry v. Saul</u>, the Fourth Circuit clarified that an "ALJ cannot summarily

'account for a claimant's limitations in concentration, persistence, and pace by restricting the

hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform

simple tasks differs from the ability to stay on task.'" <u>Shinaberry v. Saul</u>, 952 F.3d 113, 121 (4th

Cir. 2020) (quoting <u>Mascio v. Colvin</u>, 780 F.3d 632, 638 (4th Cir. 2015)). However, <u>Mascio</u> does

"not impose a categorical rule that requires an ALJ to always include moderate limitations in

concentration, persistence, or pace as a specific limitation in the RFC." <u>Id</u>. In contrast,

<u>Shinaberry</u> highlights "sister circuits" who conclude that "limiting the hypothetical to include

only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or

pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine

tasks, or unskilled work, despite [these] limitations." <u>Id</u>. (quoting <u>Winschel v. Comm'r of Soc.

Sec.</u>, 631 F.3d 1176, 1180 (11th Cir. 2011)). <u>Shinaberry</u> further confirms that <u>Mascio</u> does not

broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace

always translates into a limitation in the RFC, but instead underscores the ALJ's duty to

adequately review the evidence and explain the decision. <u>See also Monroe</u>, 826 F.3d 176

(emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

This is not a situation like <u>Mascio</u>, where the ALJ summarily concluded that a limitation to simple, unskilled work accounts for the claimant's moderate impairment in concentration, persistence and pace without further analysis.[9] Unlike the claimant in <u>Mascio</u>, the medical evidence here supports the ALJ's conclusion that, despite his moderate limitations in concentration, persistence, or pace, Stephen is capable of performing the basic mental demands of sedentary work, with the specified accommodations. The ALJ explained why Stephen's moderate limitations in concentration, persistence, or pace and interacting with others did not translate into a limitation in the RFC beyond not performing production rate or pace work, defined as having to keep up with an assembly line, or a job with strict daily or hourly quotas, and no more than occasional interaction with the public. R. 21. The ALJ also supported his finding that Stephen could sustain his task over a normal workday, and accounted for Stephen's moderate impairments in his hypothetical questions to the VE and the RFC finding in his ruling.

The ALJ noted that Stephen generally did not complain to his treating doctors of difficulty maintaining concentration, persistence, or pace, and likewise, his treating doctors did not observe him to be overly distractable or slow. R. 20. Stephen often reported adequate symptom control from his psychiatric medications and had intact attention and concentration on mental status examinations. <u>Id.</u> The ALJ detailed that while Stephen saw his primary care doctor for routine follow-up visits related to his mental impairments, he "did not usually report

---

[9] The Commissioner also points out that the RFC, by definition, is a determination of the sustained work-related activity a claimant can do on a "regular and continuing basis" defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." D.'s Br. at 22, Dkt. 18 <u>citing</u> 20 C.F.R. §§404.1545(b),(c) and SSR 96-8p, 1996 WL 374184, at * 1-2.

significant symptoms." R. 26. Instead, the "treatment notes . . . usually showed . . . normal

insight, judgment, concentration, memory, mood, and affect at appointments." Id. While

acknowledging this factor was not dispositive, the ALJ noted it was one factor in weighing the

allegations of mental symptoms. R. 26–27. The ALJ explained that because Stephen did report

anxiety and depression during the relevant period, and testified he "has difficulty with stress,"

the RFC precludes production rate or pace work, so he will not have to keep up with an assembly

line or be in a job with strict daily or hourly quotas.[10] R. 20, 26.

Similarly, regarding Stephen's moderate limitation in interacting with others, the ALJ

explained that because of Stephen's testimony that he did not like to go out in public very much,

and his complaints of anxiety to his treating practitioners, the RFC is limited to only occasional

public interaction. R. 19, 27. However, the ALJ also noted that the record shows Stephen

generally interacted normally with his treating practitioners, who did not observe deficiencies in

eye contact, speech, or conversation. R. 19. Stephen did go shopping in public and was able to

live with his family "without serious problems." Id. The ALJ also noted that Stephen's anxiety

symptoms were usually well controlled by medications. R. 27. Finally, as the Commissioner

points out, none of Stephen's doctors indicated any functional limitations due to his mental

impairments. D.'s Br. at 23, Dkt. 18. Accordingly, I recommend finding that substantial evidence

supports the ALJ's mental RFC determination.

### C. Physical RFC and Function-by-Function Analysis

Stephen argues that the ALJ's physical RFC findings are not supported by substantial

evidence and that the ALJ failed to perform a proper function-by-function analysis. In support,

---

[10] This discussion directly contradicts Stephen's claim that "[t]he only discussion regarding [his] limitations in concentration, persistence, pace, or in interacting with others, occurs in the . . . listing [section of the ALJ opinion]." Pl.'s Br. at 28. Indeed, as the Commissioner states, "even a cursory glance at the ALJ's discussion . . . shows that plaintiff is wrong on this point." D.'s Br. at 23, Dkt. 18.

Stephen points to his testimony that he cannot sit more than 30 to 45 minutes before he must

walk around to loosen up his back, that he lies down at least four times a day, and that he has

neuropathy in both hands, as well as limited use of his right hand since his finger laceration in

2017, specifically difficulty writing and performing fine manipulation. Stephen also complains

that the ALJ erred by finding his right finger laceration a non-severe impairment, as his doctor

noted the middle finger "will never be completely straight." Pl.s' Br. at 30, Dkt. 16. The

Commissioner responds that the ALJ properly found Stephen's finger laceration not a severe

impairment, and that the ALJ's physical RFC assessment "fully complies with SSR 96-8p and

Fourth Circuit law." D.'s Br. at 24, Dkt. 18.

     A function-by-function analysis requires the ALJ to develop an adequate RFC which

accounts for the work activities the claimant can perform given the physical or mental

impairments affecting his ability to work.  Importantly, the ALJ must explain the conclusions

reached and explain any record evidence which contradicts the RFC determination. See SSR 96-

8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ

needs to provide an explicit explanation linking medical evidence listed in the decision to his

ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence

supporting his conclusion, discuss the individual's ability to perform sustained work activities in

an ordinary work setting on a regular and continuing basis, describe the maximum amount of

each work-related activity the individual can perform, and explain how any material

inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996

WL 374184, at *7.

     In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ

does not perform an explicit function-by-function analysis," agreeing instead with the Second

Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p, and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Stephen's medical records, the medical opinions, Stephen's hearing testimony, and the ALJ's conclusions.

As a preliminary matter, the ALJ did not err in finding Stephen's finger laceration non-severe. An impairment is non-severe when it does not significantly limit an individual's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522. "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)). Likewise, an impairment is severe only if it significantly limits an individual's ability to do basic work activities. 20 C.F.R. §§404.1520(c). Additionally, an impairment must last, or be expected to last

for a continuous period of at least 12 months to be considered "severe." 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). Stephen bears the burden of proving that his finger laceration is severe. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

Further, under 20 C.F.R. § 404.1523, the ALJ must consider the combined effect of a claimant's impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. "Thus, the issue of whether or not a particular impairment is found severe is only critical if the ALJ finds no severe impairment and ends the analysis at step two; if any impairment is severe, the ALJ must consider all impairments when assessing residual functional capacity." Miller v. Astrue, No. 8:10-1142-HMH-JDA, 2011 WL 1576203, at *15 (D.S.C. Apr. 7, 2011). Consequently, any error by the ALJ at step two is harmless if the ALJ considers the effects of all of Stephen's impairments in the subsequent steps. See Brooks v. Astrue, No. 5:10CV00104, 2012 WL 1022309, at *12 (W.D. Va. Mar. 26, 2012) (citing Miller, 2011 WL 1576203, at *15); see also Gaskins v. Comm'r, No. WDQ–13–1470, 2014 WL 979205, at *5 (D. Md. March 12, 2014); Hammond v. Astrue, No. TMD 11–2922, 2013 WL 822749, at *2 (D. Md. March 5, 2013) (collecting cases).

Here, substantial evidence supports the ALJ's conclusion that Stephen's finger laceration was non-severe. The ALJ wrote, "In 2017, [Stephen] experienced a finger laceration and underwent surgery. It healed as expected, and he has had no treatment or complaints in several years." R. 17. The ALJ also referenced the vocational expert's testimony that even if Stephen was limited to frequent handling and fingering, he could still perform the jobs provided. Id.

Stephen injured his right middle finger in April 10, 2017 while he was using a table saw. R. 469.[11] Doctors assessed him with a laceration of the extensor tendon and he underwent a

---

[11] At the hearing, Stephen testified that he cut his finger with a table saw when he was "doing work around the house, framing out a new frame for the new door." R. 50.

surgical repair on April 28, 2017. R. 474, 663.  At his post-surgical appointment on May 9, 2017

he reported he was "doing well." R. 663. At a follow-up appointment in October 2017, he

reported "doing well without complaints." R. 649. Stephen cites to this October appointment for

the specific phrase used by Brian Torre, M.D. that the "finger will never be completely straight,"

arguing this meant it did not actually "heal as expected." Pl.'s Br. at 30, Dkt. 16. In fact, Dr.

Torre writes:

> [Stephen] is aware that his right long finger will never be completely straight, but he has
> regained flexion which is functionally more important. He is quite pleased with the
> function of his finger and [can] perform routine activities as tolerated without restrictions.
> Follow up [as needed].

R. 650. Thus, Dr. Torre did not state the finger was not healing as expected, nor did he indicate

any functional restrictions related to the finger. Stephen has not met his burden of establishing

that his finger laceration is severe, including that it lasted 12 months. Because the record does

not show that Stephen's finger laceration significantly limits his ability to do basic work

activities, the ALJ properly found it was non-severe and his step two analysis is supported by

substantial evidence.

Substantial evidence also supports the ALJ's physical RFC assessment. The ALJ's

opinion specifies how the limitations in the RFC correlate with Stephen's impairments. The ALJ

explained that the evidence is consistent with a sedentary RFC because at many of his doctor

appointments in 2016 and 2017 he walked with an antalgic gait, complained of lower back pain

and obtained a spinal cord stimulator "which is somewhat aggressive treatment" and testified

that he can walk 10 to 15 minutes at a time. R. 25. The ALJ also noted the that his lumbar spine

degeneration findings were consistent with sedentary work, and that while imaging showed some

degeneration, there was no nerve impingement or other findings that would correlate with

debitating pain. Id. Contrary to Stephen's argument that the ALJ did not explain why he

discounted his claim that he had to change positions while sitting, the ALJ wrote:

> [Stephen] has some tenderness, limited range of motion, and an antalgic gait, but this is
> not inconsistent with sedentary work. Additionally, he reported he can stand or walk for
> 10 to 15 minutes at a time before he needs to sit down. He testified he has to change
> positions when sitting, but there is no objective evidence to justify such limitation in the
> RFC.

R. 26. In support, the ALJ previously noted in his opinion that, the imaging in the record from

April 2013 showed only mild degenerative disc disease and a small lumbar herniation, that did

not appear to affect any nerves. R. 23. Likewise, despite Stephen's complaints of pain, his doctor

"usually noted normal physical examination results, other than [his] BMI . . ." and Stephen

reported to his doctor that his "pain limited his activity and caused difficulty with walking, but

he did not report difficulty sitting or the need to elevate his legs." R. 23. Even into 2017, during

visits to his pain management doctor, the ALJ noted that Stephen's physical examination

"remained about the same with tenderness, limited range of motion, and antalgic gait [but]

normal muscle strength, tone, reflexes, and sensation." R. 24. Accordingly, I recommend finding

that substantial evidence supports the ALJ's physical RFC determination.

### D. Subjective Allegations

Stephen argues that ALJ's assessment of his allegations is not supported by substantial

evidence and characterizes the ALJ's decision as "misleading" and "cursory." Stephen also

argues that the ALJ erred by relying on his daily activities to show he is capable of working,

including by failing to "qualify the extent to which" he performed the activities, i.e. at his own

pace, intermittently, or with assistance from his wife.[12] Pl.'s Br. at 35, Dkt. 16.

---

[12] Stephen also reiterates that the ALJ erred in rejecting his allegation that he must change positions while
sitting, but I have already addressed this argument and need not do so again.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step

analysis when considering a claimant's subjective statements about impairments and symptoms.

Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-

3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).

First, the ALJ looks for objective medical evidence showing a condition that could reasonably

produce the alleged symptoms, such as pain.[13] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the

ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c),

416.929(c). In making that determination, the ALJ must "examine the entire case record,

including the objective medical evidence; an individual's statements about the intensity,

persistence, and limiting effects of symptoms; statements and other information provided by

medical sources and other persons; and any other relevant evidence in the individual's case

record." Id.

The ALJ's opinion includes a detailed discussion of Stephen's medical history, along

with Stephen's own allegations, and the ALJ adequately supported his finding that Stephen's

allegations were not entirely consistent with the medical evidence and other evidence in the

record. The ALJ acknowledged Stephen's testimony at the hearing, including his alleged

limitations in sitting and walking, and his need to lie down during the day. R. 21–22. The ALJ

did not contend that Stephen was not in pain, or did not have limitations; instead, the ALJ

---

[13] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

explained that the imaging showing lumbar spine degeneration, as well as findings on exam of tenderness, limited range of motion, and antalgic gait, are "not inconsistent with sedentary work." R. 26. The ALJ specified that his antalgic gait, as well as complaints of lower back pain and use of a spinal cord stimulator, are medical evidence of record supporting a sedentary RFC. R. 25.

Stephen also states that the ALJ mischaracterizes his treatment as generally routine or conservative, when "these treatments are clearly neither routine nor conservative as they include surgeries [for carpal tunnel and to repair a laceration on his finger]." Pl.'s Br. at 33, Dkt. 16. However, the ALJ accurately described Stephen's treatment for his severe impairments, which primarily included medications for his chronic conditions, as well as periodic injections for back pain, as essentially routine and or conservative, with the exception of the spinal cord stimulator, which the ALJ described as "somewhat aggressive treatment." R. 22–23, 25. The surgeries that Stephen references are not related to his severe impairments, and the ALJ properly discusses them as follows:

> In 2017, [Stephen] experienced a finger laceration and underwent surgery. It healed as expected, and he has had no treatment or complaints in several years. [Stephen] was treated for trigger finger in the left middle finger. He underwent a release procedure and received injections in 2016. Treatment records show he was doing well nine days after his operation, and he did not seek treatment after that. Therefore, these impairments are non-severe.

R. 17. Finally, the ALJ also appropriately relied on Stephen's daily activities, including his ability to perform household activities such as cooking, cleaning, and shopping, as just one of several reasons to discount his subjective allegations. Other reasons included Stephen's failure to report significant symptoms from his gout, diabetes, hypertension, sleep apnea, depressive disorder, and anxiety at his follow-up appointments. R. 25–26. Likewise, the ALJ acknowledged Stephen's testimony that "since around January 2017, he does not drive much or leave the house

much." R. 22. This is the ALJ's job, to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work.  See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Stephen's subjective complaints with substantial evidence, and that Stephen is capable of performing work at the level stated in the ALJ's opinion.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days.  Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered:  October 13, 2022

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge